UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Perla A.,<br><br>                    Plaintiff,<br><br>v.<br><br>Kilolo Kijakazi, Acting Commissioner of<br>Social Security,[1]<br><br>                    Defendant. | Civil No. 3:20-CV-01750-SRU<br><br><br><br>March 3, 2022 |

## RECOMMENDED RULING ON PENDING MOTIONS

The Plaintiff, Perla A.,[2] appeals the decision of the Commissioner of Social Security ("Commissioner" or "Defendant"), rejecting her application for Title II Disability Insurance ("DI") benefits. (Compl., ECF No. 1.) She has moved for judgment on the pleadings (ECF No. 19), seeking an order "that the ALJ decision be rescinded and the matter remanded." (ECF No. 21, at 11-12.). The Commissioner has moved for an order affirming the decision. (ECF No. 25.) The presiding District Judge, the Honorable Stefan R. Underhill, referred the two motions to me, Magistrate Judge Thomas O. Farrish, for recommended rulings. (ECF No. 9.)

The Plaintiff makes two principal arguments. First, she contends that the Administrative Law Judge ("ALJ") committed legal error by failing to properly evaluate her limitations in

---

[1]     When the Plaintiff filed this action, she named the then-Commissioner of the Social Security Administration, Andrew Saul, as the defendant. (Compl., ECF No. 1.) Commissioner Saul no longer serves in that office. His successor, Acting Commissioner Kilolo Kijakazi, is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d). The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

[2]     Pursuant to Chief Judge Underhill's January 8, 2021 Standing Order, the Plaintiff will be identified solely by first name and last initial throughout this opinion. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

1

concentration, persistence and pace ("CPP"). (ECF No. 21, at 4-7.) The Plaintiff suffers from the psychological conditions of depression and post-traumatic stress disorder, and from the neurological conditions of narcolepsy and cataplexy, and she argues that the ALJ erred by considering – at most – only those CPP limitations that arose out of her psychological conditions in making his residual functional capacity ("RFC") determination. (*Id.*) Second, she says that the ALJ improperly discounted her hearing testimony and other record evidence about the intensity, persistence and limiting effects of her impairments. (*Id.* at 7-11.) She testified, among other things, to having "daily" blackouts and feeling "constantly confused" (R. 50, 45), and she argues that "there is nothing in the record that would give the ALJ reason to disbelieve [her] testimony and statements regarding these" symptoms. (ECF No. 21, at 7-11.) The Commissioner responds that "[b]oth arguments lack merit" because the ALJ's decision was free from legal error and supported by substantial evidence. (ECF No. 25-1, at 1-2.)

Having carefully considered the parties' submissions, and having carefully reviewed the entire administrative record, I conclude that the ALJ did not sufficiently document his credibility determinations with respect to the Plaintiff's claimed limitations from narcolepsy and cataplexy. He wrote that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 18.) But he did not explain which statements he believed, which statements he disbelieved, and why. As a result, I cannot tell (for example) whether he disbelieved the Plaintiff when she said that she blacked out once a day, or whether instead he believed her but thought he had adequately accounted for the blackouts in his RFC. While "an ALJ is free to accept or reject testimony," his credibility determinations "must nevertheless be set forth with sufficient specificity to permit intelligible review of the record." *Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir.

2

1988); *see also Rivera v. Berryhill*. No. 3:17-cv-1760 (SRU), 2019 WL 4744821, at *13 (D. Conn. Sept. 30, 2019). The ALJ did not do so in this case, and I therefore recommend that the Plaintiff's Motion for Order (ECF No. 19) be **GRANTED;** that the Commissioner's Motion for an Order Affirming the Decision (ECF No. 25) be **DENIED**; and that the Commissioner's decision be vacated and the case remanded for further administrative proceedings.

I.   FACTUAL AND PROCEDURAL BACKGROUND

On May 4, 2018, the Plaintiff filed an application for DI benefits under Title II. (R. 12, 181-82.) She claimed that he could not work because of narcolepsy, cataplexy, depression, and post-traumatic stress disorder ("PTSD").[3] (R. 75.) She alleged a disability onset date of March 30, 2018.[4] (R. 181.)

On August 29, 2018, the Social Security Administration ("SSA") found that the Plaintiff was "not disabled." (R. 84-85.) The SSA again denied her claim on reconsideration on December 21, 2018. (R. 101.) The Plaintiff then requested a hearing before an ALJ, and on November 27, 2019, Judge Michael McKenna held a hearing. (R. 28-73.) The Plaintiff's counsel, Gabriel Hermann, appeared on her behalf. (R. 28.) The ALJ also heard testimony from a vocational expert ("VE"), Courtney Olds. (R. 37.)

---

[3]   The SSA defines narcolepsy as "a chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep accompanied by three accessory events: 1. Cataplexy—attacks of loss of muscle tone, sometimes with actual collapse, during which the individual always remains conscious. 2. Hypnagogic hallucinations—hallucinations which occur between sleep and wakening. 3. Sleep paralysis—a transient sensation of being unable to move while drifting into sleep or upon awakening. In addition, some persons have periods of automatic behavior and most have disturbed nocturnal sleep." POMS DI 2458.005, *Evaluation of Narcolepsy*.

[4]   The relevant period under review for Plaintiff's DI benefits runs from March 30, 2018, her alleged onset date, through the date of the ALJ's decision, January 23, 2020. 20 C.F.R. §§ 404.130, 404.315(a); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989). The Plaintiff's date last insured for DI benefits is December 31, 2023. (R. 14.)

On January 23, 2020, the ALJ issued an unfavorable decision. (R. 12-22.) As will be discussed below, ALJs are required to follow a five-step sequential evaluation process in adjudicating Social Security claims (*see* discussion, Section II *infra*), and ALJ McKenna's written decision followed that format. At Step One of his analysis, he found that the Plaintiff had not engaged in substantial gainful activity since her claimed disability onset date of March 30, 2018. (R. 14.) At Step Two, he found that the Plaintiff suffers from the severe impairments of narcolepsy and cataplexy. (*Id.*) He found the Plaintiff's major depressive disorder and PTSD to be non-severe (R. 15), and while he also noted evidence in the record that she had received treatment for myalgias, obesity, and headaches, he found those impairments to be non-severe as well. (R. 14-15.) At Step Three, he concluded that the Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of one of the "Listings" – that is, the impairments listed in 20 C.F.R. Part 404, Subpart B, Appendix 1. (R. 16.) He then determined that, notwithstanding her impairments, the Plaintiff retained the residual functional capacity to:

> [P]erform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant would not be able to climb ladders, ropes or scaffolds and would have to avoid hazards such as heights and moving machinery. The claimant would be able to perform simple routine tasks and no fast-paced production or assembly line type work.

(R. 20.) At Step Four, the ALJ found that the Plaintiff was not capable of performing her past relevant work as a nurse supervisor and office nurse. (R. 20.) At Step Five, he relied on VE Olds' testimony to conclude that there are a significant number of jobs in the national economy that the Plaintiff could perform, such as mail sorter, office helper, and housekeeper. (R. 21-22.) In summary, he found that the Plaintiff had not been under a disability, as defined in the Social Security Act, from March 30, 2018, through January 23, 2020. (R. 22.)

On February 24, 2020, the Plaintiff requested that the Appeals Council review the ALJ's decision. (R. 177-79.) The Council found "no reason under our rules to review the [ALJ']s

decision" and, therefore, denied the Plaintiff's request for review. (R. 1.) It added that if the Plaintiff wished to contest it, he could "ask for court review . . . by filing a civil action." (R. 2.)

The Plaintiff then filed this action on November 21, 2020. (Compl., ECF No. 1.) The Commissioner answered the complaint by filing the administrative record on March 22, 2021. (ECF No. 17; *see also* D. Conn. Standing Scheduling Order for Social Security Cases, ECF No. 4, at 2 (stating that the Commissioner's filing of the administrative record is "deemed an Answer (general denial) to Plaintiff's Complaint").) On April 7, 2021, the Plaintiff filed her motion for an order reversing or remanding the Commissioner's decision. (ECF Nos. 19, 21.) On June 28, 2021, the Commissioner filed a motion for an order affirming that decision. (ECF No. 25.) The Plaintiff filed her reply brief on July 7, 2021. (ECF No. 26.) The parties' motions are therefore ripe for decision.

## II. APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)). To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity . . . ." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)). At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments . . . ." *Id.* At Step Three, the ALJ then evaluates whether the claimant's disability "meets or equals the severity" of one of the "Listings"

– that is, the specified impairments listed in the regulations. *Id.* At Step Four, the ALJ uses an RFC assessment to determine whether the claimant can perform any of her "past relevant work." *Id*. At Step Five, the ALJ addresses "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *Id.* The claimant bears the burden of proving her case at Steps One through Four. *Id.* At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *See Williams*, 859 F.2d at 258 (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . .") (citations omitted). Though the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's

judgment. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error. In other words, district courts do not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.   DISCUSSION

As noted above, the Plaintiff makes two principal arguments.[5] She first contends that the ALJ did not consider the effect of her narcolepsy- and cataplexy-related symptoms on her CPP when formulating her RFC. (ECF No. 21, at 4-7.) She next argues that the ALJ improperly discounted her testimony about the intensity, persistence and limiting effects of those symptoms. (*Id.* at 7-11.) Because the ALJ's credibility determination is integral to his RFC determination, I address the Plaintiff's second argument first.

### A.   The ALJ's Treatment of the Plaintiff's Testimony About the Intensity, Persistence and Limiting Effects of Her Symptoms

At her hearing, the Plaintiff testified that her narcolepsy and cataplexy significantly affect her life. She testified that she never feels rested in the morning (R. 41-42), and that she gets only two to three hours of sleep each night. (R. 45.) She said that she can only drive for twenty minutes

---

[5]   The Plaintiff's brief may be read as making a third, distinct argument that the ALJ also committed error at Step Two, which I address in Section IV below.

7

at a time, and must take Adderall before doing so. (R. 46.) She stated that when she reads, she can only read a paragraph at a time (R. 53), and that her tiredness and difficulty concentrating would be the biggest impediments to her ability to work. (R. 55-56.) She added that two to three times a week, she "can't get anything done" in the house, like cooking or cleaning. (R. 52.) Perhaps most significantly, she claimed to experience "daily" blackouts even while taking Adderall. (R. 50, 55-56.)

The ALJ evidently did not credit all of this testimony. To be sure, he listened to it carefully, as evidenced by his long and accurate recapitulation. (R. 17-18.) And he agreed that the Plaintiff's medically determinable impairments could reasonably be expected to cause the claimed symptoms. (R. 18.) But he nonetheless concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id*.)

The Plaintiff argues that "there is nothing in the record that would give the ALJ reason to disbelieve [her] testimony and statements regarding" the intensity and limiting effects of her symptoms. (ECF No. 21, at 8.) She notes that her diagnoses of narcolepsy and cataplexy are undisputed, and indeed the ALJ cited a sleep study from Yale Sleep Medicine "which supported" these diagnoses. (*Id.* at 8; *see also* R. 18.) The Plaintiff says that where "there is no reason to disbelieve [her] statements regarding her symptoms and limitations," "[i]t is axiomatic that if a condition is present and medical signs and findings show impairments that can reasonably be expected to cause the complaints, the complaints must be accepted." (ECF No. 21, at 9.)

The Commissioner denies that the ALJ "'disbelieve[d]' Plaintiff's statements in their entirety" – but argues that, to the extent that he did so, he had "good reasons." (ECF No. 25-1, at 3-4.) The Commissioner begins by noting that, in "concluding that [the Plaintiff] could no longer

perform her past relevant work of nurse supervisor and office nurse, the ALJ necessarily found that Plaintiff's impairments limited her significantly." (ECF No. 25-1, at 3.) She adds that "[f]ar from disbelieving Plaintiff's complaints, the ALJ relied on her symptoms to formulate the RFC." (*Id.*) But then she acknowledges that the ALJ declined to adopt all of "the Plaintiff's statements about the extent of her limitations." (*Id.* at 4) (emphasis in original). She says that, to the extent that the ALJ disbelieved her, he was entitled to do so because some of her statements were not "consisten[t] . . . with the evidence of record." (*Id.*) In the case of the claimed daily blackouts, for example, the Commissioner notes that the Plaintiff "went outside daily, drove daily, and was able to go out alone . . . activities that are not fully consistent with episodes of work-preclusive blackouts." (*Id.*) She also notes that the Plaintiff's "providers cautioned her against driving or engaging in potentially hazardous activities if drowsy, but did not impose any other restrictions on her activities." (*Id.*) (citing R. 364, 372, 381, 503).

The parties' dispute implicates the SSA's two-step process for evaluating a claimant's symptoms. *See* 20 C.F.R. 404.1529(c)(1); *see also* Soc. Sec. R. ("SSR") 16-3P, 2017 WL 5180304, at *3 (S.S.A. Oct. 25, 2017) ("We use a two-step process for evaluating an individual's symptoms."). In the first step of the process, the ALJ must determine whether the "medical signs or laboratory findings" show that the claimant "has a medically determinable impairment . . . that could reasonably be expected to produce" the claimed symptoms. *Id.* If so, the ALJ then proceeds to the second step, at which he evaluates "the intensity and persistence of [the claimant's] symptoms such as pain," and determines the extent to which those symptoms "limit his or her ability to perform work-related activities." *Id.* at *4; *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

9

In performing the second step, "the ALJ must consider all of the available evidence, including objective medical evidence, from both medical and nonmedical sources." *Gonzalez v. Berryhill*, No. 3:18-cv-00241 (SRU), 2020 WL 1452610, at *12 (D. Conn. Mar. 25, 2020). The ALJ "may not reject a claimant's subjective opinion regarding the intensity and persistence" of her symptoms "'solely because the available objective medical evidence does not substantiate . . . her statements." *Id.* (quoting 20 C.F.R. § 416.929(c)(2)) (alteration omitted); *see also* 20 C.F.R. § 404.1529(c)(2). If there is a conflict between the objective evidence and the claimant's testimony, "the ALJ 'must consider the other evidence,'" including "(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; (5) treatment, other than medication, received for pain relief; (6) measures taken to relieve pain and other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* (quoting *Graf v. Berryhill*, No. 3:18-cv-00093 (SRU), 2019 WL 1237105, at *8 (D. Conn. Mar. 18, 2019)) (internal quotation marks and alterations omitted); *see also* 20 C.F.R. § 404.1529(c)(3).

Provided that the ALJ follows this process, his conclusions are ordinarily entitled to deference from this Court. "It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). These findings "are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d

10

1035, 1042 (2d Cir. 1997) (quoting *Lennon v. Waterfront Transp.*, 20 F.3d 658, 661 (5th Cir. 1994)); *see also Gonzalez*, 2020 WL 1452610, at *13 (same).

Should an ALJ choose to discredit the claimant's testimony, however, he "must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence." *Crysler v. Astrue*, 563 F. Supp. 2d 418, 440 (N.D.N.Y. 2008); *see also Thomas v. Comm'r of Soc. Sec. Admin.*, No. 19-cv-1177 (GWG), 2020 WL 4757059, at *8 (S.D.N.Y. Aug. 18, 2020) (citing *Williams*, 859 F.2d at 260-61) (holding that "the basis for the finding must be . . . set forth with sufficient specificity to permit intelligible plenary review of the record") (internal quotation marks omitted). "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3P, 2017 WL 5180304, at *9 (S.S.A. Oct. 25, 2017).

In this case, the ALJ's discussion was insufficiently specific with respect to the Plaintiff's narcolepsy and cataplexy. He merely summarized the record evidence without explaining how or why it contradicted the Plaintiff's testimony. He began by stating that "the claimant's statements about the intensity, persistence, and limiting effects of . . . her symptoms" were "inconsistent because the overall medical evidence of record and the radiographic findings do not support the level of limitation alleged." (R. 18.) He then discussed a report from the Yale Sleep Medicine Program – which, he acknowledged, "supported the diagnosis of narcolepsy and cataplexy." (*Id.*) He twice noted that "[a]n MRI of the brain and an electroencephalogram was normal," but he did not explain why, if at all, this constituted cause for disbelieving the Plaintiff's testimony about the

11

effects of her narcolepsy.[6]  He noted that the Plaintiff's mental status evaluations reflected normal findings for cognition, thought content, thought processing, and memory and no evidence of any thought disorder or cognitive disorder (*id*; *see also* R. 380, 403, 502-03, 508), but he did not explain why these psychological findings constituted cause for discrediting the Plaintiff's claims about daily blackouts, among other neurological issues.

The ALJ addressed several of the 20 C.F.R. § 404.1529(c)(3) factors, but here too, he did not adequately explain why his observations amounted to reasons for disbelieving the Plaintiff. With respect to activities of daily living, he noted that the Plaintiff was "able to cook, clean, and perform household chores with breaks, drive an automobile short distances, shop with her sister, attend her children's teacher conferences, drive the children to and from the bus stop, handle her finances and socialize with family members" (R. 18) (citing, *inter alia*, R. 211-21), but he said this in the context of the Plaintiff's psychological impairments.  He did not explain why cooking, cleaning, and driving short distances immediately after administration of Adderall constituted reasons for discrediting the Plaintiff's claims about blackouts and an inability to concentrate.  As for effectiveness of medication, the ALJ noted that Adderall had reduced the frequency of the Plaintiff's blackouts, and that it was effective for up to four to six hours at a time.  (R. 17; *see also* R. 55.)  But he did not point to any evidence suggesting that Adderall entirely eliminated the blackouts.

In other words, the ALJ "failed to build an accurate and logical bridge from the evidence to his conclusion that [the Plaintiff's] testimony was not credible."  *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (internal

---

[6]  I note that the Programs Operations Manual section on narcolepsy advises ALJs that it is not necessary to obtain an EEG in narcolepsy cases as the findings are typically normal.  POMS DI 24580.005, *Evaluation of Narcolepsy*.

quotation marks omitted). In his credibility determination, the ALJ explicitly mentioned the Plaintiff's pain complaints and her depression, but he failed to directly address the claimed symptoms of her narcolepsy, and particularly her claim of daily blackouts. (R. 18.) Put differently, the ALJ has summarized medical evidence and discussed some of the required seven factors, but he does not explain why this evidence undermines the Plaintiff's testimony on her limitations.

The Fourth Circuit's holding in *Monroe* illustrates the ALJ's error. In *Monroe*, the plaintiff filed applications for DI and SSI benefits, claiming that he was disabled due to uveitis, back pain, breathing and memory problems, anxiety, depression, and blackouts as a result of narcolepsy. 826 F.3d at 178. He testified that he suffered from extreme fatigue and two to three times a day he would have blackouts where he would lose consciousness. *Id.* at 181. The ALJ found that his claimed symptoms were not credible. *Id.* at 188. In finding the ALJ's credibility determination inadequate, the Fourth Circuit observed that "the ALJ does not indicate how any of the facts he cited show that Monroe did not lose consciousness two or three times daily or suffer extreme fatigue." *Id.* at 190. The court further explained that "[i]n citing 'normal' results from pulmonary and respiratory tests and an EEG, the ALJ did not explain why he believed these results had any relevance to the question of what symptoms Monroe suffered *from narcolepsy*." *Id.* (emphasis in original). Likewise, the ALJ here mentioned that an MRI of the brain and an EEG were normal and that mental status evaluations found no evidence of cognitive disorders, but failed to explain how this is inconsistent with the Plaintiff's testimony. (R. 18.) Ultimately, the court in *Monroe* ordered that the ALJ must "provide a clearer explanation of his reasons" for "discredit[ing] Monroe's testimony regarding his episodes of loss of consciousness and fatigue." *Monroe*, 826 F.3d at 190.

To be sure, an ALJ "is not required to explicitly address each and every statement made in the record that might implicate his evaluation of the claimant's credibility as long as the evidence of record permits [the court] to glean the rationale of an ALJ's decision." *Pappas v. Saul*, 414 F. Supp. 3d 657, 683 (S.D.N.Y 2019) (internal quotation marks omitted). Here, however, I am unable to discern the rationale for the ALJ's decision. For example, it is not clear whether the ALJ did not believe the Plaintiff's claims that she loses consciousness every day, or whether instead he believed those claims but thought the RFC was nevertheless sufficient. As in *Monroe*, "[o]n remand, if the ALJ decides to discredit [the Plaintiff's] testimony regarding [her] episodes of loss of consciousness and fatigue, it will be incumbent on him to provide a clearer explanation of his reasons for doing so, such that it will allow meaningful review of his decision." *Monroe*, 826 F.3d at 190.

### B.   The RFC Determination is Insufficient

The Plaintiff argues that the ALJ's RFC was defective because it "failed to properly consider the impact of [her] blackouts, headaches and daytime sleepiness." (ECF No. 21, at 4.) Perhaps tacitly conceding that a limitation to "simple routine tasks" is ordinarily sufficient to address mild limitations in CPP arising from of *psychological* impairments, *see Major v. Saul*, 2020 WL 5793468, at *16 (D. Conn. Sept. 29, 2020) (collecting cases), she contends that her case is different because her *neurological* impairments would force her to "be off task during the work day" and "tardy or absent on an unpredictable basis" in a way that would not be accounted for by such a limitation. (ECF No. 21, at 4.) She says that, in failing to expressly incorporate things like blackouts, headaches and daytime sleepiness into the RFC, the ALJ breached his duties to consider *all* of the Plaintiff's impairments in evaluating disability. (*Id.* at 4) (citing *McIntyre*, 758 F.3d at 152).

The Commissioner says that the ALJ did consider the Plaintiff's neurological symptoms in formulating the RFC.  Specifically, the ALJ stated in his decision that he "considered . . . the claimant's subjective complaints of fatigue and difficulty concentrating due to her depressive symptoms and fatigue related to narcolepsy when [he] limited her to performing simple routine tasks with no fast-paced production or assembly type work."  (R. 19.)  He did not expressly state that he considered blackouts of any particular frequency, or any particular amount of off-task time, tardiness or absenteeism.

In the course of deciding that the Plaintiff retained the residual functional capacity to perform simple routine tasks, the ALJ summarized the findings of consultative examiners Drs. Rahim Shamsi and March Hillbrand, non-examining state agency medical consultants Drs. Therese Harris and Adrian Brown, and Dr. Christine Won, a specialist in sleep medicine, who completed a mental impairment questionnaire.  (R. 19-20.)  The ALJ stressed the essentially normal findings from these doctors, specifically that the Plaintiff would be able to understand instructions and get along with supervisors, comprehend and carry out simple tasks throughout a normal workday, and interact appropriately with others with only minimal impairment.  (R. 19-20, 82, 99, 398, 420.)

Despite these findings, the Plaintiff argues that the limitation to simple tasks is insufficient, asserting that the RFC does not account for her difficulties with concentration.  The Plaintiff also argues that the limitation to unskilled work without production demands only addresses the severity of her impairment and ignores the frequency and duration of her impairment.  (ECF No. 21, at 5.)  She contends that, by ignoring these dimensions, the ALJ failed to consider the effect of the sleep disorders on her ability to be punctual and maintain appropriate concentration and attendance.

Because the ALJ's hypothetical did not include blackouts and extreme fatigue – symptoms to which the Plaintiff testified, but the ALJ improperly discredited for the reasons discussed above – his RFC cannot be sustained on the current record. The hypothetical posed to the VE posited an individual "with the ability to perform all ranges of work. This individual would not be able to climb ladders, ropes, or scaffolds. And would have to avoid hazards such as heights and moving machinery. And this individual would be able to perform simple, routine tasks, and no fast-paced production or assembly-line type of work." (R. 65.) The RFC limited the plaintiff to unskilled work, but it contains no durational limitations, and seemingly no limitations addressing loss of consciousness except for those related to heights and machinery. In the absence of sufficiently documented reasons for discrediting the Plaintiff's statements about the extent of her symptoms, the hypothetical and resulting RFC would have had to account for her claimed blackouts and extreme fatigue. "A hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 211 (N.D.N.Y. 2009) "Because the ALJ never determined the extent to which [the Plaintiff] actually experienced episodes of loss of consciousness and extreme fatigue, we cannot determine whether the hypothetical questions posed to the VE included all of [the Plaintiff's] functional limitations . . . ." *Monroe*, 826 F.3d at 188. Accordingly, on remand, the ALJ will have to either adequately document reasons for discrediting the Plaintiff's testimony, or consider, *inter alia*, whether she will be unable to complete a normal workday due to her blackouts and extreme fatigue. *See Olivia S. v. Saul*, No. CV 1:20-2054-SVH, 2021 WL 1049936, at *19 (D.S.C. Mar. 19, 2021) (holding that ALJ erred in failing to consider the plaintiff's statements to multiple providers that she could not complete a normal workday due to falling asleep and those symptoms would impose additional non-exertional limitations); *see also Mascio v. Colvin*, 780

F.3d 632, 636-37 (4th Cir. 2015) ("Here, the ALJ has determined what functions he believes [the plaintiff] can perform, but his opinion is sorely lacking in the analysis needed for us to review meaningfully those conclusions.  In particular, although the ALJ concluded that [the plaintiff] can perform certain functions, he said nothing about [his] ability to perform them for a full workday.").

## IV. CONCLUSION

In closing, I note that the Plaintiff's brief could be construed as raising a third, distinct argument.  She recounts how the ALJ evaluated her limitations in CPP at Step Two, and says that in doing so, he "did not analyze the impact of the narcolepsy and cataplexy on this function." (ECF No. 21, at 3.)   She contends that this constituted error at the RFC stage (*id.*) ("This failure results in an incomplete RFC"), and for the reasons discussed above, I agree that the ALJ erred at that stage.  But to the extent that she is contending that this failure constituted an independent, Step Two error – in other words, to the extent that she is claiming that an ALJ must consider the effects of neurological impairments when applying the Paragraph B criteria in assessing the severity of mental impairments at Step Two – that argument is insufficiently developed.

For the reasons stated above, I conclude that the ALJ's decision was not free from legal error.  Therefore, I recommend that the Plaintiff's Motion for Order (ECF No. 19) be **GRANTED;** that the Commissioner's Motion for an Order Affirming the Decision (ECF No. 25) be **DENIED**; and that the Commissioner's decision be vacated and the case remanded for further administrative proceedings.

This is a recommended ruling by a Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(1).  Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of being served with this order.  *See* Fed. R. Civ. P. 72(b)(2).  Failure to object within fourteen (14) days will preclude appellate review.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72;

D. Conn. L. Civ. R. 72.2; *Impala v. United States Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989)(per curiam).

<em>/s/ Thomas O. Farrish</em><br>
Hon. Thomas O. Farrish<br>
United States Magistrate Judge